Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Priscilla D. Kam (PK 1505)
Vincent J. Pontrello (VP 0848)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY,   GEICO   INDEMNITY   COMPANY,
GEICO   GENERAL   INSURANCE   COMPANY   and
GEICO CASUALTY COMPANY,                                      Docket No.:

                                       Plaintiffs,

                 -against-

CAREWELL, INC.,
d/b/a ELITE DRUGS & SURGICAL SUPPLY,
ILYA ILYAYEV and
JOHN DOE DEFENDANTS "1" – "5,"

                                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**<u>COMPLAINT</u>**

     Plaintiffs  Government  Employees  Insurance  Company,  GEICO  Indemnity  Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Carewell, Inc. d/b/a Elite Drugs &

Surgical Supply, Ilya Ilyayev, and John Doe Defendants Numbers "1" through "5" (collectively,

"Defendants"), hereby allege as follows:

1.       This action seeks to terminate a fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $801,000.00 in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, hundreds of fraudulent claims to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, primarily in the form of topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment (collectively, the "Fraudulent Topical Pain Products"), as well as a limited variety of other medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.       Defendants Carewell Inc. d/b/a Elite Drugs & Surgical Supply ("Elite Drugs") and its owner, Ilya Ilyayev ("Ilyayev"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  To exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescriptions drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices.

3.       As part of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and persons who work at or are associated with various multidisciplinary medical clinics (the "Clinic Controllers") that almost exclusively treat No-Fault patients, and steered them to direct large volumes of prescriptions to Elite Drugs for the targeted Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals.

4.      The Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Elite Drugs for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Elite Drugs typically submitted claims to GEICO seeking $2,264.00 for a single tube of Diclofenac Sodium Gel 3% and $1,522.00 to $1,902.50 for a single tube of Lidocaine 5% Ointment.

5.      The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed risks to patients' health, safety, and well-being.  For example, the Defendants, without regard to genuine patient care, repeatedly dispensed large quantities of diclofenac sodium in the form of Diclofenac Sodium Gel 3%, which has risks that include gastrointestinal effects and major cardiovascular events, and large quantities of lidocaine, which can cause heart arrhythmia and toxic blood levels if not used correctly, while also often contemporaneously dispensing other, duplicative medications to the Insureds to maximize profits.

6.      By this action, GEICO seeks to recover more than $290,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Elite Drugs of over $510,000.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Elite Drugs for the Fraudulent Pharmaceuticals   because:

(i)      The Defendants billed for pharmaceutical products through Elite Drugs that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to

direct illegal prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs in exchange for unlawful kickbacks or other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Elite Drugs dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)    the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Elite Drugs pursuant to illegal, invalid, and duplicitous prescriptions.

7.    The Defendants fall into the following categories:

(i)    Elite Drugs is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals, pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled;

(ii)    Ilyayev is the record owner of Elite Drugs; and

(iii)    John Doe Defendants "1" through "5" are persons and entities, presently not identifiable, who are not and never have been licensed healthcare professionals but who, along with Ilyayev, participated in the operation and control of Elite Drugs and facilitated the illegal, collusive relationships with the Prescribing Providers and the Clinic Controllers.

8.    The Defendants' scheme began in 2019 and continues through the present day as the Defendants continue to seek reimbursement of their unpaid fraudulent claims. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and at the risk of patient health and safety; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs in exchange for unlawful kickbacks and/or

4

other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Elite Drugs dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, Elite Drugs does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth a sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $290,000.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

11.      Defendant Elite Drugs is a New York corporation, formed on or about November 15, 2016, with its principal place of business at 111-14 Liberty Avenue, Richmond Hill, New York.

12.     Elite Drugs knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

13.     Defendant Ilyayev resides in and is a citizen of New York. Ilyayev is the owner of Elite Drugs.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of New York's No-Fault Laws**

18.     GEICO underwrites automobile insurance in the State of New York.

19.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§

65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

20.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

23.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

24.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

25.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   Overview of Applicable Licensing Laws

26.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

27.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

28.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

29.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, contraindications,

drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

30.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

31.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

32.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

33.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

34.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

35.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

36.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

37.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

## III.     The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.     Overview of the Scheme

38.     Beginning in 2019, and continuing through the present day, the Defendants – including Elite Drugs, Ilyayev, and John Doe Defendants "1" through "5" – masterminded and implemented a fraudulent scheme in which they used Elite Drugs to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

39.     Elite Drugs purported to be a storefront neighborhood pharmacy operating in Queens County, New York but instead operated as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

40.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Elite Drugs' business was largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

41.     The Fraudulent Topical Pain Products were designed to exploit the Insureds for financial gain, as they were typically prescribed based on generic, preprinted, and boilerplate examination reports designed to justify continuing, voluminous, and excessive healthcare

services.  Moreover, the Fraudulent Topical Pain Products themselves often have no proven efficacy and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

42.     The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

43.     In fact, Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment account for approximately 94% of the total claims for reimbursement that Defendants submitted to GEICO. The claims the Defendants submitted through Elite Drugs for these specific Fraudulent Topical Pain Products have resulted in approximately $800,000.00 in billing to GEICO.

44.     Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which noted that diclofenac and lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

45.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers and, in exchange for the payment of kickbacks or other financial incentives, steered them to prescribe large volumes of medically unnecessary Fraudulent Topical Pain Products to Insureds treating at various multidisciplinary medical clinics that primarily treat No-Fault patients ("No-Fault Clinics") and to direct those prescriptions to Elite Drugs.

46.     Specifically, the Defendants paid unlawful kickbacks or provided other incentives to the Prescribing Providers and Clinic Controllers and, in exchange, the Prescribing Providers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products) and routed those prescriptions to the Defendants.  This permitted the Defendants to submit egregious claims for reimbursement for the Fraudulent Topical Pain Products to GEICO through Elite Drugs.

47.     The No-Fault Clinics and the Prescribing Providers operating therefrom and who directed prescriptions to Elite Drugs have often been the subject of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

48.     For example, in Government Employees Insurance Company, et al. v. Custom RX Pharmacy, LLC, et al., 20-cv-02622 (CBA) (SJB) (E.D.N.Y. 2020), Radha Gara, M.D. ("Dr. Gara") appeared for a nonparty deposition and testified that multiple prescriptions submitted to GEICO in support of the pharmacy's charges were altered from his original prescription to include additional unauthorized topical pain products. Dr. Gara also identified several prescriptions on which his signature was forged. Dr. Gara testified that this activity took place at several No-Fault Clinics, including clinics located at 97-01 101st Avenue, Ozone Park, New York and 92-08 Jamaica Avenue, Woodhaven, New York, which also routed prescriptions to Elite Drugs.

49.     Furthermore, at other No-Fault Clinics that routed prescriptions to Elite Drugs GEICO received billing for an excessive and myriad amount of purported healthcare services from a "revolving door" of different healthcare providers, moving in and out without any

legitimate reason beyond billing for as many services as possible and as quickly as possible.  For example, GEICO received billing for purported healthcare services rendered at the clinic located at 3027 Avenue V, Brooklyn, New York from a "revolving door" of approximately 70 purportedly different healthcare providers; GEICO received billing for purported healthcare services rendered at the clinic located at 170 W. 233rd Street, Bronx, New York from a "revolving door" of more than 31 purportedly different healthcare providers; and GEICO received billing for purported healthcare services rendered at the clinic located at 3250 Westchester Avenue, Bronx, New York from a "revolving door" of approximately 43 purportedly different healthcare providers .

50.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No-Fault Clinics to provide Elite Drugs with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

51.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

52.     In keeping with the collusion between the Defendants and the Prescribing Providers and Clinic Controllers, many Insureds who received prescriptions from Elite Drugs reside outside of Queens County where Elite Drugs is located while some reside an hour from Elite Drugs. Specifically, 63.8% of Insureds that were dispensed Fraudulent Pharmaceuticals from Elite Drugs reside outside of Queens County.

53.     The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Elite Drugs to insurers and financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

## B.     The Fraudulent Pharmaceuticals were Prescribed and Dispensed Without Regard to Genuine Patient Care in Order to Exploit Patients for Financial Gain

54.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Elite Drugs – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

55.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral

NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

56.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

57.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

58.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example, patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral

NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

59.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from Elite Drugs, and who were treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

60.     As part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the providers at the No-Fault Clinics purported to render to the Insureds.  These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products, primarily in the form of exorbitantly priced topical pain products, including Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment.

61.     To the extent any examination was performed, the Prescribing Providers, at times, failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.  In the event a medical history was documented, such history was not considered and had no effect on the Prescribing Provider's recommended treatment plan for the patient including whether to prescribe Fraudulent Pharmaceuticals.

62.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient medical and allergy history, or without considering such history, demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know,

or care, whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

63.     The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications or whether oral medications were otherwise contraindicated thereby necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Elite Drugs.

64.     The Prescribing Providers did not document in their examination reports any reason why the Fraudulent Topical Pain Products prescribed were medically necessary and, at times, failed to even document that a Fraudulent Topical Pain Product was even prescribed at all.

65.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products prescribed to a particular patient were used by the patient.

66.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

67.     At times, the recommendation and treatment plans of a Prescribing Provider's examination reports were inconsistent with the medications actually prescribed and dispensed. For example:

> i.     Insured LV was allegedly involved in a motor vehicle accident on October 18, 2019. Thereafter, LV sought treatment with Joseph A. Raia, M.D., P.C. ("Raia PC") at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Joseph Raia, M.D. ("Dr. Raia") on January 13, 2020.  Dr. Raia's treatment plan directed LV to take Tylenol and Motrin PRN. Thereafter, on January 23, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Raia dated January 13, 2020.

ii.  Insured DR was allegedly involved in a motor vehicle accident on December 13, 2019. Thereafter, DR sought treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Dr. Raia on January 27, 2020.  Dr. Raia's treatment plan directed DR to take Tylenol and Motrin PRN. Thereafter, on February 4, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Raia dated January 27, 2020.

iii.  Insured DM was allegedly involved in a motor vehicle accident on April 7, 2020. Thereafter, DM sought treatment with Apex Medical, P.C. ("Apex Medical") at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with Kaur Navdeep, N.P. ("NP Navdeep") on April 17, 2020.  NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on April 27, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to a prescription allegedly issued by NP Navdeep dated April 17, 2020.

iv.  Insured BM was allegedly involved in the same motor vehicle accident as DM, supra, on April 7, 2020. Thereafter, BM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on April 17, 2020.  NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on April 27, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Patches, Diclofenac Sodium Gel 3%, and Esomeprazole Magnesium pursuant to prescriptions allegedly issued by NP Navdeep dated April 17, 2020.

v.  Insured MM was allegedly involved in a motor vehicle accident on March 18, 2020. Thereafter, MM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on April 1, 2020.  NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on April 3, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment and Cyclobenzaprine pursuant to prescriptions allegedly issued by NP Navdeep dated April 3, 2020.

vi.  Insured NR was allegedly involved in a motor vehicle accident on October 18, 2019. Thereafter, NR sought treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent a follow-up examination with Dr. Raia on January 13, 2020.  In the examination report, Dr. Raia noted that NR was feeling much better and reached maximum medical improvement ("MMI") and did not indicate any prescriptions for NR. Thereafter, more than two months later, on March 29, 2020, Elite Drugs dispensed and billed

for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Raia on January 13, 2020.

vii.   Insured DW was allegedly involved in the same motor vehicle accident as DW and RR, <u>supra</u>, on March 18, 2020. Thereafter, WS sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on April 1, 2020.  NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on April 5, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment and Ibuprofen pursuant to prescriptions allegedly issued by NP Navdeep dated April 1, 2020.

viii.   Insured AM was allegedly involved in a motor vehicle accident on December 18, 2019. Thereafter, AM sought treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Dr. Raia on January 27, 2020.  Dr. Raia's treatment plan directed DR to take Tylenol and Motrin PRN. Thereafter, on January 30, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Raia dated January 27, 2020.

ix.   Insured JP was allegedly involved in a motor vehicle accident on January 6, 2020. Thereafter, JP sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York, and underwent an initial examination with Dr. Rodriguez on January 9, 2020.  Dr. Rodriguez did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on February 10, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine pursuant to a prescription allegedly issued by Dr. Rodriguez dated January 30, 2020. Notably, there is no indication that Dr. Rodriguez examined JP on January 30, 2020.

x.   Insured VP was allegedly involved in a motor vehicle accident on August 18, 2019. Thereafter, VP sought treatment with Parkway Medical Services, P.C. ("Parkway Medical") at a No-Fault Clinic located at 3250 Westchester Avenue, Suite 205, Bronx, New York, and underwent a follow up examination with Stella Amanze, P.A. ("PA Amanze") on October 9, 2019.  PA Amanze did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Further, the examination report states that PA Amanze discussed her examination with David Suarez, D.O. ("Dr. Suarez"). Thereafter, on December 2, 2019, Elite Drugs dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Suarez dated October 30, 2019. Notably, there is no indication that PA Amanze or Dr. Suarez examined VP on October 30, 2019.

xi.   Insured RR was allegedly involved in a motor vehicle accident on February 26, 2020. Thereafter, RR sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on March 4, 2020.  NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Thereafter, on March 13, 2020, Elite Drugs dispensed and billed for Ibuprofen and Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Rehman dated March 4, 2020.

68.    Notably, some of the examples above where the recommendation and treatment plans of a Prescribing Provider's examination reports were inconsistent with the medications actually prescribed and dispensed involved treatment at the  92-08 Jamaica Avenue, Woodhaven, clinic, which is one of the clinics where Dr. Gara in the *Custom Rx* litigation testified that his original prescriptions were altered to include additional topical pain products that he did not authorize and/or contained a forged signature in support of the pharmacy's charges.

69.    In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary, Elite Drugs frequently dispensed medications to the patients many weeks, or sometimes months, after the medication were prescribed to the patients. For example:

i.    Insured MG was allegedly involved in a motor vehicle accident on December 18, 2019. Thereafter, MG sought treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Dr. Raia on January 20, 2020. Dr. Raia prescribed Lidocaine 5% Ointment pursuant to a prescription issued on January 20, 2020. More than two months later, on March 28, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment.

ii.    Insured FG was allegedly involved in a motor vehicle accident on December 13, 2019. Thereafter, FG sought treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York, and underwent an initial examination with Dr. Raia on January 20, 2020.  Dr. Raia prescribed Diclofenac Sodium Gel 3% pursuant to a prescription issued on January 20, 2020. More than two months later, on March 28, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%.

iii.    Insured LV was allegedly involved in a motor vehicle accident on January 12, 2020. Thereafter, LV sought treatment with Neighborhood Medical at a No-Fault

Clinic located at 170 W 233rd Street, Bronx, New York, and underwent an initial examination with Dr. Rodriguez on January 27, 2020.   Dr. Rodriguez recommended Nexium, Flexeril, Ibuprofen, and Lidocaine 5% Ointment. Three months later, on April 27, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine (Flexeril), and Esomeprazole Magnesium (Nexium) pursuant to prescriptions allegedly issued by Dr. Rodriguez on February 25, 2020.  Further, it does not appear that Dr. Rodriguez saw LV for a follow-up examination on February 25, 2020.

iv.   Insured RR was allegedly involved in a motor vehicle accident on March 18, 2020. Thereafter, RR sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with Dr. Shirin on April 6, 2020.  Dr. Shirin prescribed Diclofenac Sodium Gel 3% and Ibuprofen. Approximately eighteen days later, on April 24, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Shirin on April 6, 2020.

v.   Insured EB was allegedly involved in a motor vehicle accident on October 16, 2019. Thereafter, EB sought treatment with Foster Medical, P.C. ("Foster Medical") at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York, and underwent a follow-up examination with Dr. Rodriguez on January 15, 2020. On February 25, 2020, Dr. Rodriguez prescribed Lidocaine 5% Ointment, Esomeprazole Magnesium, Cyclobenzaprine, and Naproxen. On April 20, 2020, approximately three months after the examination and over two months after Dr. Rodriguez issued the prescription, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Esomeprazole Magnesium, Cyclobenzaprine, and Naproxen pursuant to prescriptions allegedly issued by Dr. Rodriguez on February 25, 2020.

vi.   Insured VP was allegedly involved in a motor vehicle accident on August 18, 2019. Thereafter, VP sought treatment with Parkway Medical at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York, and underwent a follow-up examination with PA Amanze on October 9, 2019.  On October 30, 2019, Dr. Suarez – the physician at Parkway Medical – prescribed Lidocaine 5% Ointment. On December 2, 2019, approximately two months after the examination and over one after the prescription was issued, Elite Drugs dispensed and billed for Lidocaine 5% Ointment pursuant to the prescription allegedly issued by Dr. Suarez on October 30, 2019.

vii.   Insured SS was allegedly involved in the same motor vehicle accident as VP, supra, on August 18, 2019. Thereafter, SS sought treatment with Parkway Medical at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York, and underwent a follow-up examination with PA Amanze on October 9, 2019.  On October 30, 2019, Dr. Suarez – the physician at Parkway Medical – prescribed Lidocaine 5% Ointment. On December 2, 2019, approximately two months after the examination and over one month after the prescription was issue, Elite Drugs

dispensed and billed for Lidocaine 5% Ointment pursuant to the prescription allegedly issued by Dr. Suarez on October 30, 2019.

viii. Insured DW was allegedly involved in a motor vehicle accident on March 18, 2020. Thereafter, DW sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on April 1, 2020.  In the examination report, NP Navdeep indicated a prescription for Flexeril (Cyclobenzaprine). Approximately twenty-two days later, on April 23, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by NP Navdeep on April 1, 2020.

70.     Notably, some of the examples above where Elite Drugs frequently dispensed medications to the patients many weeks, or sometimes months, after the medication were prescribed to the patients involved treatment at the 92-08 Jamaica Avenue, Woodhaven, clinic, which is one of the clinics where Dr. Gara in *Custom Rx* testified that his original prescriptions were altered to include additional topical pain products that he did not authorize and/or contained a forged signature in support of the pharmacy's charges.

71.     In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with the same Prescribing Provider.

72.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

73.     It is extremely improbable that multiple Insureds involved in the same automobile accident who treated with the same Prescribing Provider would routinely require the same pharmaceutical products.

74.    Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider. For example:

i.    On December 22, 2019, two Insureds – JL and ER – were involved in the same automobile accident. Thereafter, JL and ER both received treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York with Dr. Rodriguez. JL and ER were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations JL and ER were both issued prescriptions from Dr. Rodriguez for Lidocaine 5% Ointment, Cyclobenzaprine, Esomeprazole Magnesium, and Ibuprofen which was dispensed and billed by Elite Drugs.

ii.    On January 13, 2020, two Insureds – EF and DT – were involved in the same automobile accident. Thereafter, EF and DT both received treatment with Raia PC at a No-Fault Clinic located at 97-01 101 Avenue, Ozone Park, New York with Dr. Raia. EF and DT were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations EF and DT were both issued prescriptions from Dr. Raia for Lidocaine 5% Ointment, Celecoxib, Tylenol, and Motrin PRN which was dispensed and billed by Elite Drugs.

iii.    On October 30, 2019, two Insureds – TB and YP – were involved in the same automobile accident. Thereafter, TB and YP both received treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York with Dr. Rehman. TB and YP were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations TB and YP were both issued prescriptions from Dr. Rehman for Lidocaine 5% Ointment and Ibuprofen which were dispensed and billed by Elite Drugs.

iv.    On March 7, 2020, two Insureds – KR and KH – were involved in the same automobile accident. Thereafter, KR and KH both received treatment with Neighborhood Medical at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York with Dr. Rodriguez. KR and KH were in different physical conditions and experienced the impact from different positions in the vehicle. Even so,

pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations KR and KH were both issued prescriptions from Dr. Rodriguez for Lidocaine 5% Ointment, Cyclobenzaprine, Naproxen, and Esomeprazole Magnesium which were dispensed and billed by Elite Drugs.

v.      On January 18, 2020, two Insureds – OG and HL – were involved in the same automobile accident. Thereafter, OG and HL both received treatment with Agape Medical at a No-Fault Clinic located at 4226A Third Avenue, Bronx, New York with Dr. Smith. OG and HL were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations OG and HL were both issued prescriptions from Dr. Smith for Lidocaine 5% Ointment, Cyclobenzaprine and an oral NSAID which were dispensed and billed by Elite Drugs. Additionally, OG was also prescribed Esomeprazole which was also dispensed and billed by Elite Drugs.

vi.     On January 17, 2020, three Insureds – YP, RC, and IS – were involved in the same automobile accident. Thereafter, YP, RC, and IS all received treatment with Agape Medical at a No-Fault Clinic located at 4226A Third Avenue, Bronx, New York, New York with Dr. Smith. YP, RC, and IS were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations YP, RC, and IS were all issued prescriptions from Dr. Smith for Lidocaine 5% Ointment and Cyclobenzaprine which were dispensed and billed by Elite Drugs. Additionally, YP and IS also received prescriptions for Naproxen which was dispensed and billed by Elite Drugs.

vii.    On January 6, 2020, two Insureds – JP and HP – were involved in the same automobile accident. Thereafter, JP and HP both received treatment with Neighborhood at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York with Dr. Rodriguez. JP and HP were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations JP and HP were both issued prescriptions from Dr. Rodriguez for Lidocaine 5% Ointment, Cyclobenzaprine, and an oral NSAID which were dispensed and billed by Elite Drugs. Additionally, HP was also prescribed Esomeprazole which was also dispensed and billed by Elite Drugs.

viii.   On January 12, 2020, two Insureds – RT and LV – were involved in the same automobile accident. Thereafter, RT and LV both received treatment with Neighborhood Medical at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York with Dr. Rodriguez. RT and LV were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations RT and LV were both issued

prescriptions from Dr. Rodriguez for Lidocaine 5% Ointment, Cyclobenzaprine, an oral NSAID, and Esomeprazole Magnesium which were dispensed and billed by Elite Drugs.

ix.     On December 1, 2019, two Insureds – LV and NR – were involved in the same automobile accident. Thereafter, LV and NR both received treatment with Raia PC at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Raia.  LV and NR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations LV and NR were both issued prescriptions from Dr. Raia for Diclofenac Sodium Gel 3% which was dispensed and billed by Elite Drugs.

x.      On October 2, 2019, two Insureds – RR and EF – were involved in the same automobile accident. Thereafter, RR and EF both received treatment with Foster Medical, P.C. ("Foster Medical") at a No-Fault Clinic located at 170 W 233rd Street, Bronx, New York with Dr. Rodriguez. RR and EF were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Elite Drugs, after their initial examinations RR and EF were both issued prescriptions from Dr. Rodriguez for Lidocaine 5% Ointment, Cyclobenzaprine, and an oral NSAID were dispensed and billed by Elite Drugs. Additionally, FE also received a prescription for Esomeprazole which was dispensed and billed by Elite Drugs.

75.     Notably, some of the examples above where two or more Insureds involved in the same motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations involved treatment at the 97-01 101 Avenue, Ozone Park, clinic and the 92-08 Jamaica Avenue, Woodhaven, clinic which are two of the clinics where Dr. Gara in *Custom Rx* testified that his original prescriptions were altered to include additional topical pain products that he did not authorize and/or contained a forged signature in support of the pharmacy's charges.

### i.      The Fraudulent Lidocaine Ointment Prescriptions

76.     In accordance with the fraudulent scheme discussed above, Elite Drugs routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions including topical

Lidocaine 5% Ointment ("Topical Lidocaine") and Diclofenac Sodium Gel 3% ("Topical Diclofenac"), pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers in exchange for kickbacks or other financial incentives.

77.     The Defendants solicited the Prescribing Practitioners and the Clinic Controllers to provide them with voluminous prescriptions for Topical Lidocaine and Topical Diclofenac because the Defendants could readily these products at low cost but have Elite Drugs bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

78.     The Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for Elite Drugs to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

79.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

80.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams. However, in many instances, Elite Drugs failed to provide dosage instructions and/or a maximum daily dose.

81.     Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

82.     For example, the Prescribing Providers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% Lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of approximately $6.99 and generally less than $10.00.

83.     Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Elite Drugs.

84.     In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. At times, the initial examination reports failed to even document that a Lidocaine 5% Ointment was prescribed in the first instance.

85.     Indeed, Lidocaine 5% Ointment was routinely prescribed at the time of the initial examination during the acute stages of the Insureds' pain symptoms before Insureds even had an opportunity to first try readily available, low-cost, over the counter lidocaine products or universally accepted oral pain medication. For example:

> i.     On January 13, 2020, Insured CB was allegedly involved in a motor vehicle accident. Later that same day, CB underwent an initial examination at Bronx County Medical Care, P.C. ("Bronx County Medical") at a No-Fault clinic located at 4014A Boston Road, Bronx, New York with Jean-Pierre Barakat, M.D. ("Dr. Barakat") who prescribed Lidocaine 5% Ointment. On January 22, 2020, Elite Drugs dispensed Lidocaine 5% Ointment to this Insured pursuant

to the prescription from Dr. Barakat ordered upon initial examination on January 13, 2020, the same day as the accident.

ii.  On January 20, 2020, Insured KA was allegedly involved in a motor vehicle accident. On January 22, 2020, KA underwent an initial examination at Agape Medical at a No-Fault clinic located at 4226A Third Avenue, Bronx, New York with Dr. Smith who prescribed Lidocaine 5% Ointment, Naproxen, and Flexeril (Cyclobenzaprine). On January 30, 2020, Elite Drugs dispensed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Smith ordered upon initial examination on January 22, 2020, two days post-accident.

iii.  On January 13, 2020, Insured DT was allegedly involved in a motor vehicle accident. On January 17, 2020, DT underwent an initial examination at Raia PC at a No-Fault clinic located at 97-01 101 Avenue, Ozone Park, New York with Dr. Raia who prescribed Lidocaine 5% Ointment and Celecoxib. On January 27, 2020, Elite Drugs dispensed Lidocaine 5% Ointment and Celecoxib to this Insured pursuant to the prescription from Dr. Raia ordered upon initial examination on January 17, 2020, four days post-accident.

iv.  On January 18, 2020, Insured CA was allegedly involved in a motor vehicle accident. On January 22, 2020, CA underwent an initial examination at Agape Medical at a No-Fault clinic located at 4226A Third Avenue, Bronx, New York with Dr. Smith who prescribed Lidocaine 5% Ointment, Naproxen, and Flexeril (Cyclobenzaprine). On January 24, 2020, Elite Drugs dispensed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Smith ordered upon initial examination on January 22, 2020, four days post-accident.

v.  On January 7, 2020, Insured RS was allegedly involved in a motor vehicle accident. On January 13, 2020, RS underwent an initial examination at Metrocare Medical, P.C. ("Metrocare Medical") at a No-Fault clinic located at 71 South Central Avenue, Valley Stream, New York with Andrew Patrick, D.O., C.P.N. ("Dr. Patrick") who prescribed Lidocaine 5% Ointment. On January 15, 2020, Elite Drugs dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Patrick ordered upon initial examination on January 13, 2020, six days post-accident.

vi.  On January 15, 2020, Insured LL was allegedly involved in a motor vehicle accident. On January 22, 2020, LL underwent an initial examination at Metrocare Medical at a No-Fault clinic located at 71 South Central Avenue, Valley Stream, New York with Dr. Patrick who prescribed Lidocaine 5% Ointment. On January 28, 2020, Elite Drugs dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Patrick ordered upon initial examination on January 22, 2020, seven days post-accident.

vii.  On January 3, 2020, Insured TL was allegedly involved in a motor vehicle

accident. On January 11, 2020, TL underwent an initial examination at Arnold Goldman, M.D., F.A.C.S. ("Goldman Practice") a No-Fault clinic located at 76-05 113th Street, Forest Hills, New York with Arnold Goldman, M.D. ("Dr. Goldman") who prescribed Lidocaine 5% Ointment. On January 14, 2020, Elite Drugs dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Goldman ordered upon initial examination on January 11, 2020, eight days post-accident.

viii.    On January 7, 2020, Insured OS was allegedly involved in a motor vehicle accident. On January 17, 2020, OS underwent an initial examination at Raia PC at a No-Fault clinic located at 97-01 101 Avenue, Ozone Park, New York with Dr. Raia who prescribed Lidocaine 5% Ointment and Celecoxib. On January 19, 2020, Elite Drugs dispensed Lidocaine 5% Ointment and Celecoxib to this Insured pursuant to the prescription from Dr. Raia ordered upon initial examination on January 17, 2020, ten days post-accident.

ix.    On January 6, 2020, Insured TW was allegedly involved in a motor vehicle accident. On January 14, 2020, TW underwent an initial examination at the Goldman Practice a No-Fault clinic located at 76-05 113th Street, Forest Hills, New York with Dr. Goldman who prescribed Lidocaine 5% Ointment. On January 15, 2020, Elite Drugs dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Goldman ordered upon initial examination on January 14, 2020, eight days post-accident.

86.    The Topical Lidocaine was prescribed upon initial examination pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved, and OTC, medications proven to have therapeutic effects and available at a fraction of the cost.

87.    In further keeping with the fact that the Topical Lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers often failed to address whether the Topical Lidocaine prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

88.    In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent,

predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneous to multiple other Fraudulent Pharmaceuticals such as oral NSAIDs and/or muscle relaxants. In fact, some Prescribing Providers routinely prescribed to Insureds, and Elite Drugs routinely dispensed and billed for, Lidocaine 5% Ointment along with the same set of oral medications, including Cyclobenzaprine, Esomeprazole Magnesium, and an oral NSAID (*i.e.*, Naproxen or Ibuprofen). For example:

    i.    Insured CT was allegedly involved in a motor vehicle accident on March 1, 2020. Thereafter, CT sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York, and underwent an initial examination with Dr. Rodriguez on March 9, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 27, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

    ii.    Insured DR was allegedly involved in a motor vehicle accident on December 21, 2019. Thereafter, DR sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on December 26, 2019. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium. On February 25, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

    iii.    Insured AT was allegedly involved in a motor vehicle accident on December 20, 2019. Thereafter, A.T. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on December 30, 2019. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium. On March 22, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

    iv.    Insured HR was allegedly involved in a motor vehicle accident on February 21, 2020. Thereafter, H.R. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on March 2, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 14, 2020, Elite Drugs dispensed

and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

v.     Insured KN was allegedly involved in a motor vehicle accident on March 3, 2020. Thereafter, K.N. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on March 11, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 13, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

vi.     Insured LF was allegedly involved in a motor vehicle accident on February 23, 2020. Thereafter, L.F. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on March 11, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 28, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

vii.     Insured LR was allegedly involved in a motor vehicle accident on February 26, 2020. Thereafter, L.R. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on March 11, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 29, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

viii.     Insured MF was allegedly involved in a motor vehicle accident on February 19, 2020. Thereafter, M.F. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on February 27, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 23, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

ix.     Insured RG was allegedly involved in a motor vehicle accident on December 17, 2019. Thereafter, R.G. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on December 30, 2019. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Cyclobenzaprine, and Esomeprazole Magnesium. On February 6, 2020, Elite Drugs dispensed and

billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

x.     Insured LR was allegedly involved in a motor vehicle accident on December 26, 2019. Thereafter, L.R. sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on January 9, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On February 6, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

xi.     Insured KH was allegedly involved in a motor vehicle accident on March 7, 2020. Thereafter, KH sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on March 10, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 21, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Naproxen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

xii.     Insured DG was allegedly involved in a motor vehicle accident on January 14, 2020. Thereafter, DG sought treatment with Neighborhood Medical at a No-Fault Clinic located at 170 West 233rd Street, Bronx, New York and underwent an initial examination with Dr. Rodriguez on January 20, 2020. Dr. Rodriguez prescribed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium. On April 21, 2020, Elite Drugs dispensed and billed for Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Esomeprazole Magnesium pursuant to Dr. Rodriguez's prescription.

89.    Elite Drugs typically billed GEICO between $1,522.00 and $1,902.50 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $473,300.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

**ii.**    **The Fraudulent Diclofenac Gel Prescriptions**

90.    In addition to the egregious number of Topical Lidocaine prescriptions dispensed by Elite Drugs, in accordance with the fraudulent scheme discussed above, Elite Drugs billed GEICO for exorbitantly priced Topical Diclofenac.

91.     Topical Diclofenac in 3% concentration is a topical NSAID approved by the United States Food and Drug Administration ("FDA") to treat a skin condition known as actinic keratoses.

92.     Topical Diclofenac does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

93.     Moreover, some clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

94.     The Prescribing Providers routinely prescribed and the Defendants routinely dispensed Diclofenac Sodium Gel 3% despite the fact that none of the Insureds suffered from actinic keratoses.

95.     Moreover, the FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" due to the potential risks of serious cardiovascular and gastrointestinal risks.

96.     A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

97.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

98.     Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe Topical Diclofenac, while oftentimes recommending the patient continue the use of oral NSAIDs, such as ibuprofen and naproxen, or simultaneously prescribing oral NSAIDs, muscle relaxers, and/or other Fraudulent Topical Pain Products such Lidocaine 5% Ointment.

99.     Prescribing Topical Diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients constitutes therapeutic duplication.

100.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and diclofenac) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit. Therapeutic duplication very often leads to emergency room visits because the use of more than one medication in the same class of drugs exacerbates the possible adverse side effects.

101.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

102.    Nevertheless, at times Prescribing Providers prescribed and the Defendants knowingly dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being. For example:

      i.    Insured RR was allegedly involved in a motor vehicle accident on February 26, 2020. Thereafter, RR sought treatment with Apex Medical at a No-Fault

Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on March 4, 2020. NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on March 13, 2020, despite the inherent risks of therapeutic duplication, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% and Ibuprofen pursuant to prescriptions allegedly written by NP Navdeep on March 4, 2020.

ii.   Insured RM was allegedly involved in a motor vehicle accident on January 21, 2020. Thereafter, RM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent a follow-up examination with NP Navdeep on March 4, 2020. NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on March 15, 2020, despite the inherent risks of therapeutic duplication, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% and Ibuprofen pursuant to prescriptions allegedly written by NP Navdeep on March 4, 2020.

iii.   Insured ZW was allegedly involved in a motor vehicle accident on April 10, 2020. Thereafter, ZW sought treatment with Raia PC at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York, and underwent an initial examination with Eric Kenworthy, M.D. ("Dr. Kenworthy") on April 14, 2020. Despite the inherent risks of therapeutic duplication, Dr. Kenworthy prescribed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Naproxen.   On April 23, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Naproxen pursuant to Dr. Kenworthy's prescription.

iv.   Insured JG was allegedly involved in a motor vehicle accident on January 20, 2020. Thereafter, JG sought treatment with Raia PC at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York, and underwent an initial examination with Dr. Kenworthy on January 28, 2020. Dr. Kenworthy prescribed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Cyclobenzaprine.  On February 3, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to Dr. Kenworthy's prescriptions.  Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

v.   Insured AJ was allegedly involved in a motor vehicle accident on January 20, 2020. Thereafter, AJ sought treatment with Raia PC at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York, and underwent an initial examination with Dr. Kenworthy on January 28, 2020. Dr. Kenworthy prescribed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and

Cyclobenzaprine.  On February 3, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Cyclobenzaprine pursuant to Dr. Kenworthy's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vi.     Insured EF was allegedly involved in a motor vehicle accident on January 20, 2020. Thereafter, EF sought treatment with Raia PC at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York, and underwent an initial examination with Dr. Raia on January 28, 2020. Despite the inherent risks of therapeutic duplication, Dr. Raia prescribed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine.  On February 3, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine pursuant to Dr. Raia's prescriptions.

vii.    Insured SM was allegedly involved in a motor vehicle accident on November 18, 2019. Thereafter, SM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an examination with Dr., Rehman on March 4, 2020. Despite the inherent risks of therapeutic duplication, Dr. Rehman prescribed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Naproxen.  On March 17, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Naproxen pursuant to Dr. Rehman's prescriptions.

viii.   Insured BM was allegedly involved in a motor vehicle accident on April 7, 2020. Thereafter, BM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an examination with NP Navdeep on April 17, 2020. NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on April 27, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3%, a Lidocaine 5% patch, and Esomeprazole Magnesium pursuant to prescriptions allegedly written by NP Navdeep. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

ix.     Insured RM was allegedly involved in a motor vehicle accident on January 21, 2020. Thereafter, RM sought treatment with Apex Medical at a No-Fault Clinic located at 3027 Avenue V, Brooklyn, New York, and underwent an initial examination with NP Navdeep on March 4, 2020. NP Navdeep did not document any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on March 15, 2020, despite the inherent risks of therapeutic duplication, Elite Drugs dispensed and billed for Diclofenac

Sodium Gel 3% and an oral NSAID pursuant to prescriptions allegedly written by NP Navdeep.

x.    Insured DR was allegedly involved in a motor vehicle accident on November 23, 2019. Thereafter, DR sought treatment with Apex Medical at a No-Fault Clinic located at 632 Utica Avenue, Brooklyn, New York, and underwent an examination with Dr. Rehman on February 26, 2020. Dr. Rehman prescribed Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment.  On March 14, 2020, Elite Drugs dispensed and billed for Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment pursuant to Dr. Rehman's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

103.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with Topical Diclofenac.

104.    The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

105.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions. At times, the initial examination reports failed to even document that a Topical Diclofenac was prescribed in the first instance.

106.    In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed

whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

107.   The Defendants almost exclusively dispensed and billed for Topical Diclofenac in the form of Diclofenac Sodium Gel 3%, typically billing $2,264.00 for a single tube of gel. The Defendants' total billing submitted through Elite Drugs to GEICO for Topical Diclofenac exceeds $276,208.00.

### iii.    The Fraudulent Cyclobenzaprine Prescriptions

108.   In further keeping with the fact that the Fraudulent Pharmaceuticals were prescribed dispensed, and billed pursuant to fraudulent treatment protocols and collusive arrangements, the Prescribing Providers at times prescribed and the Defendants dispensed Fraudulent Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

109.   In accordance with best practices, a prescription for a seven-to-ten-day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers often prescribed, and the Defendants dispensed, thirty-day to ninety-day supplies of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury. For example:

> i.   Insured LV was allegedly involved in a motor vehicle accident on January 12, 2020. Thereafter LV sought treatment with Neighborhood Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. LV underwent an initial examination on January 27, 2020, with Dr. Rodriguez. On February 25, 2020, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine. On April 27, 2020, over four months post-accident and two months since Dr. Rodriguez issued the prescriptions, Elite Drugs dispensed Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and

Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated February 25, 2020.

ii.   Insured EB was allegedly involved in a motor vehicle accident on October 16, 2019. Thereafter, EB sought treatment with Foster Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. EB underwent an initial examination on October 25, 2019 with Dr. Rodriguez. On February 25, 2020, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine, approximately three months post-accident. On April 29, 2020, over six months post-accident and two months since Dr, Rodriguez issued the prescriptions, Elite Drugs dispensed Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated February 25, 2020.

iii.   Insured DV was allegedly involved in a motor vehicle accident on August 27, 2019. Thereafter, DV sought treatment with Foster Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. DV underwent an initial examination on November 21, 2019 with Dr. Rodriguez. On December 2, 2019, over three months post-accident, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Ibuprofen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine. On December 5, 2019, Elite Drugs dispensed Lidocaine Ointment 5%, Ibuprofen, Esomeprazole Magnesium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated December 2, 2019.

iv.   Insured BC was allegedly involved in a motor vehicle accident on September 18, 2019. Thereafter, BC sought treatment with Foster Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. DV underwent an initial examination on October 30, 2019 with Dr. Rodriguez. On December 2, 2019, over two and half months post-accident, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine. On December 5, 2019, Elite Drugs dispensed Lidocaine Ointment 5%, Naproxen, Esomeprazole Magnesium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated December 2, 2019.

v.   Insured GK was allegedly involved in a motor vehicle accident on August 7, 2019. Thereafter, GK sought treatment with Foster Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. DV underwent an initial examination on November 5, 2019 with Dr. Rodriguez. On December 1, 2019, almost four months post-accident, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Ibuprofen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine. On December 5, 2019, Elite Drugs dispensed Lidocaine Ointment 5%, Ibuprofen, Esomeprazole

Magnesium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated December 1, 2019.

vi.   Insured MM was allegedly involved in a motor vehicle accident on September 15, 2019. Thereafter, MM sought treatment with Brooklyn Doc Medical, P.C. ("Brooklyn Doc Medical") at a No-Fault clinic located at 1849 Utica Avenue, Brooklyn, New York. MM underwent a follow-up examination on December 30, 2019 with Ananthakumar Thillainathan, M.D. ("Dr. Thillainathan"). On December 30, 2019, three and a half months post-accident, Dr. Thillainathan issued prescriptions for Diclofenac Sodium Gel 3% and a ninety-day prescription for Cyclobenzaprine,. Over two months later, on February 14, 2020, Elite Drugs dispensed Diclofenac Sodium Gel 3% and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Thillainathan dated December 30, 2019.

vii.   Insured WB was allegedly involved in a motor vehicle accident on September 18, 2019. Thereafter, WB sought treatment with Queens Wellness, Inc. ("Queens Wellness") at a No-Fault clinic located at 205-16 Jamaica Avenue, Hollis, New York. WB underwent an initial examination on January 27, 2020 with Alexander Baldonado, M.D. ("Dr. Baldonado"). On January 27, 2020, over three months post-accident, Dr. Baldonado issued prescriptions for Lidocaine 5% Ointment, Meloxicam, and a ninety-day prescription for Cyclobenzaprine. Three weeks later, on February 18, 2020, Elite Drugs dispensed Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Baldonado dated January 27, 2020.

viii.   Insured LC was allegedly involved in a motor vehicle accident on November 10, 2019. Thereafter, LC sought treatment with Time To Care Medical, P.C. ("Time To Care Medical") at a No-Fault clinic located at 222-01 Hempstead Avenue, Queens Village, New York. LC underwent a follow-up examination on February 25, 2020 with Rafael Delacruz-Gomez, M.D. ("Dr. Delacruz-Gomez"). On February 25, 2020, over three months post-accident, Dr. Delacruz-Gomez issued a prescription for a thirty-day prescription for Cyclobenzaprine. Three weeks later, on March 13, 2020, Elite Drugs dispensed Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Delacruz-Gomez dated February 25, 2020.

ix.   Insured RT was allegedly involved in a motor vehicle accident on January 12, 2020. Thereafter, RT sought treatment with Foster Medical at a No-Fault clinic located at 170 West 233 Street, Bronx, New York. RT underwent an examination on January 27, 2020 with Dr. Rodriguez. On February 25, 2020, Dr. Rodriguez issued prescriptions for Lidocaine Ointment 5%, Ibuprofen, Esomeprazole Magnesium, and a ninety-day prescription for Cyclobenzaprine, approximately six weeks post-accident. On March 2, 2020, Elite Drugs dispensed Lidocaine Ointment 5%, Ibuprofen, Esomeprazole

Magnesium, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Rodriguez dated February 25, 2020.

x.   Insured SW was allegedly involved in a motor vehicle accident on September 15, 2019. Thereafter, SW sought treatment with St. Sebastian Medical, P.C. ("St. Sebastian Medical") at a No-Fault clinic located at 205-16 Jamaica Avenue, Hollis, New York. SW underwent an initial examination on February 12, 2020 with Dr. Baldonado. On February 12, 2020, almost five months post-accident, Dr. Baldonado issued prescriptions for Lidocaine Ointment 5%, Naproxen, and a sixty-day prescription for Cyclobenzaprine. On February 18, 2020, Elite Drugs dispensed Lidocaine Ointment 5%, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Baldonado dated February 12, 2020.

C.   **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribing Providers and Clinic Controllers**

110.   To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Elite Drugs for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

111.   New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

112.   New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7).  In fact, New York Education Law § 6811(7) makes such agreements criminal.

113.   Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have

41

the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Elite Drugs so that the Defendants could bill GEICO huge sums.

114.    In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

115.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any regard to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

116.    In many instances, Elite Drugs failed to submit a legitimate prescription with its bill or submitted a prescription printout to pass it off as an electronic prescription to GEICO and other New York insurers.

117.    The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing,

and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Elite Drugs, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from Elite Drugs in Queens County, New York and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients' residences.

118.    At times, Elite Drugs purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

119.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Elite Drugs directly from the front desk staff at the various No-Fault Clinics, again without ever even knowing that they were to receive a Fraudulent Pharmaceutical

120.    The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Elite Drugs, and to ensure that the Defendants benefitted financially from the prescriptions.

121.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

122.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

123.    The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including

intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Elite Drugs, unless they profited from their participation in the illegal scheme.

124.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Elite Drugs.

125.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

126.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Elite Drugs.

127.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.      The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

128.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

129.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which

the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

130.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

131.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

132.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high average wholesale prices.

133.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Elite Drugs' billing and maximize their profits.

134.    In support of their charges, the Defendants typically submitted: (i) a copy of the Prescribing Providers' prescription or a printed record of an electronic prescription; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, drug names, units, and corresponding charges for each drug product or ingredient; (iii) a delivery receipt which included the Insureds' demographics, dates the prescription was purportedly delivered the

purported NDC numbers, drug names, and units,; and (iv) an executed assignment of benefits form assigning the Insureds' benefits to the Defendants.

135.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

136.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much Elite Drugs actually paid the supplier for the Fraudulent Topical Pain Products.

137.    The Defendants never submitted to GEICO any documents evidencing whether Elite Drugs actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

138.    In fact, Elite Drugs never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

139.    Elite Drugs paid only a fraction of the "average wholesale price" of the Topical Diclofenac that the Defendants targeted to use in connection with Elite Drugs' billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

140.    Further, upon information and belief, Elite Drugs often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used

the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

## IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

141.   To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Elite Drugs seeking payment for pharmaceuticals for which Elite Drugs is ineligible to receive.

142.   These forms, including NF-3 forms and/or HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Elite Drugs for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions; and

iv.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## V.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

143.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

144.     To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

145.     Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

146.     The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

147.     The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

148.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Elite Drugs continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Elite Drugs has been engaged in fraud.

149.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $290,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

150.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

151.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

152.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $510,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Elite Drugs.

153.    Elite Drugs has no right to receive payment for any pending bills submitted to GEICO because Elite Drugs billed for pharmaceutical products that were medically unnecessary

and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

154.    Elite Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs in exchange for unlawful kickbacks and/or other financial incentives.

155.    Elite Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Elite Drugs dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

156.    Elite Drugs has no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Elite Drugs pursuant to the illegal, invalid, and duplicitous prescriptions, and they continue to reimbursement of their unpaid fraudulent claims.

157.    The Defendants, including Elite Drugs, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

158.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Elite Drugs has no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against Ilyayev
### (Violation of RICO, 18 U.S.C. § 1962(c))

159.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

160.    Elite Drugs is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

161.    Ilyayev knowingly conducted and/or participated, directly or indirectly, in the conduct of Elite Drugs' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over thirteen months, seeking payments that Elite Drugs was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs in exchange for unlawful kickbacks and/or other financial incentives; (iii) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; and (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.   The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity

identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

162.    Elite Drugs' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ilyayev operated Elite Drugs, inasmuch as Elite Drugs never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Elite Drugs to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Elite Drugs to the present day.

163.    Elite Drugs is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by Elite Drugs in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

164.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $290,000.00 pursuant to the fraudulent bills submitted by the Defendants through Elite Drugs. The chart attached hereto as Exhibit "1" sets forth a sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.

165.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

166.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

167.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Elite Drugs.

168.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Elite Drugs was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Elite Drugs in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Elite Drugs was acting in accordance with material licensing requirements and, therefore, eligible

to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; and (iv) in every claim, the representation that Elite Drugs was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

169.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Elite Drugs that were not compensable under the No-Fault Laws.

170.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $290,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Elite Drugs.

171.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

172.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

173.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

174.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

175.    When GEICO paid the bills and charges submitted by or on behalf of Elite Drugs for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

176.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

177.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

178.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $290,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Elite Drugs has no right to receive payment for any pending bills, amounting to approximately $510,000.00 in charges submitted to GEICO;

B.    On the Second Claim For Relief against Ilyayev, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $290,000.00, together with

treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

        C.      On the Third Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $290,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

        D.      On the Fourth Claim for Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $290,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       February 9, 2022

                    RIVKIN RADLER LLP

                    By:    /s/ *Michael A. Sirignano, Esq.*

                       Michael A. Sirignano (MS 5263)
                       Barry I. Levy (BL 2190)
                       Priscilla D. Kam (PK 1505)
                       Vincent J. Pontrello (VP 0848)
                926 RXR Plaza
                Uniondale, New York 11556
                (516) 357-3000

                *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*